UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-- against --

DONTAI CABRERA,

Defendant.

Case No. 1:10-cr-00094-07-JSR

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DONTAI CABRERA'S
MOTION FOR A SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

Richard F. Albert
Margaret N. Vasu
Morvillo Abramowitz Grand Iason &
Anello P.C.
565 Fifth Avenue
Tel: (212) 880-9600
New York, NY 10007
ralbert@maglaw.com
mvasu@maglaw.com

*Attorneys for Dontai Cabrera*

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  FACTUAL & PROCEDURAL BACKGROUND ...............................................2

    A.   Dontai's Background ................................................................................2

    B.   Offense Conduct ......................................................................................6

    C.   Procedural History ...................................................................................6

    D.   Statutory and Guidelines Provisions Applicable to Dontai's Sentence ...................7

    E.   Dontai's Sentencing Hearing ..................................................................8

    F.   Dontai's Post-Conviction Litigation .......................................................9

III. ARGUMENT .....................................................................................................10

    A.   The Court has the Authority to Reduce Dontai's Sentence to Time-Served .........11

    B.   Dontai has Exhausted His Administrative Remedies .............................13

    C.   Extraordinary and Compelling Reasons Support the Reduction of Dontai's
        Twenty-Year Sentence to Time-Served ................................................14

        1.   The Circumstance of Dontai's Offense and Need to Avoid Unwarranted
            Sentencing Disparities ...............................................................14

        2.   The Unusually Onerous Conditions of Dontai's Incarceration: COVID-19 ...17

        3.   Dontai's History, Characteristics and Exceptional Rehabilitation ..................20

            a.   Rehabilitation ...................................................................21

            b.   Dontai's Ten Years of Clean Disciplinary History ...........22

            c.   Dontai's Continued Family Support ..................................22

IV.  CONCLUSION ..................................................................................................25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Pepper v. United States*,
  562 U.S. 476 (2011) ..................................................................................................... 24

*United States v. Avery*,
  No. 14 Cr. 810 (JMF), 2020 WL 6728781 (S.D.N.Y. Nov. 16, 2020)..................................... 20

*United States v. Austin*,
  No. 06 Cr. 991 (JSR), (S.D.N.Y., June 23, 2020) .................................................... 12

*United States v. Barajas*,
  No. 18 Cr. 736 (NSR), 2020 WL 3976991 (S.D.N.Y. July 13, 2020) ..................................... 19

*United States v. Brooker*,
  976 F.3d 228 (2d Cir. 2020) .............................................................................................. 12

*United States v. Carty*,
  264 F.3d 191 (2d Cir. 2001) .............................................................................................. 18

*United States v. Clare*,
  No. 12 Cr. 792 (ARR), (E.D.N.Y. Jan. 25, 2021) ..................................................... 17

*United States v. Davis*,
  No. 06 Cr. 20020-002 (SEM), 2020 WL 4049980 (C.D. Ill. July 20, 2020) ........................... 19

*United States v. Florez*,
  447 F.3d 145 (2d Cir. 2006) .............................................................................................. 14

*United States v. Griffiths*,
  954 F. Supp. 738 (D. Vt. 1997) ......................................................................................... 24

*United States v. Haynes*,
  No. 93 Cr. 1043 (RJD), ECF Dkt. 114 (E.D.N.Y. Apr. 22, 2020) ............................................ 13

*United States v. Martin*,
  No. 18 Cr. 834 (PAE), 2020 WL 1819961 (S.D.N.Y. Apt. 10, 2020) ..................................... 19

*United States v. Martinez*,
  No. 4 Cr. 48 (JSR), 2019 WL 2433660 (S.D.N.Y. June 11, 2019) ............................................ 16

*United States v. Maumau*,
  No. 08 Cr. 758 (TC), 2020 WL 806121 (D. Utah Feb. 18, 2020).............................................. 13

*United States v. McRae*,
No. 17 Cr. 643 (PAE), 2021 WL 142277 (S.D.N.Y. Jan. 15, 2021) .......................................... 12

*United States v. Millan*,
No. 91 Cr. 685 (LAP), ECF Dkt. 1060 (S.D.N.Y. Apr. 6, 2020) ........................................ 12, 13

*United States v. Modesto*,
No. 17 Cr. 251 (PGG), 2020 WL 4735340 (S.D.N.Y. Aug. 13, 2020) .................................... 17

*United States v. Neiman*,
828 F. Supp. 254 (S.D.N.Y. 1993) ........................................................................................ 24

*United States v. Osuna*,
No. 02 Cr. 1327 (CPS), 2008 WL 1836943 (E.D.N.Y. Apr. 22, 2008) ................................... 22

*United States v. Pinto-Thomaz*,
No. 18 Cr. 579 (JSR), 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) ..................................... 12

*United States v. Redd*,
No. 97 Cr. 06 (AJT), 2020 WL 1248493 (E.D. Va. Mar. 16, 2020) .................................. 11, 13

*United States v. Rodriguez*,
651 F. App'x 44 (2d Cir. 2016) .............................................................................................. 18

*United States v. Torres*,
No. 17 Cr. 501 (NSR), ECF Dkt. 23 (S.D.N.Y. Aug. 7, 2020) ................................................. 20

*United States v. Urkevich*,
No. 03 Cr. 37, 2019, WL 6037391 (D. Neb. Nov. 14, 2019) ................................................... 13

*United States v. Whitemore*,
573 F. App'x 24 (2d Cir. 2014) .............................................................................................. 16

*United States v. Williams*,
No. 19 Cr. 134 (PWG), 2020 WL 3073320 (D. Md. June 10, 2020) ...................................... 19

*United States v. Yellin*,
No. 15 Cr. 3181 (BTM), 2020 WL 3488738 (S.D. Cal. June 26, 2020) .................................. 19

*United States v. Young*,
458 F. Supp. 3d 838 (M.D. Tenn. 2020) ................................................................................ 11

*United States v. Zoquier-Solano*,
No. 13 Cr. 772 (JPO), ECF Dkt. 45 (S.D.N.Y. Aug. 10, 2020) ............................................. 20

**Statutes**

18 U.S.C. § 924(c)(1)(A)(iii) ................................................................................................ 6, 7

18 U.S.C. § 3553(a)(6) ................................................................................................... 17

18 U.S.C. § 3582(c)(1)(A) ............................................................................... *passim*

18 U.S.C. § 3582(c)(2) ..................................................................................................... 22

21 U.S.C. § 812 ................................................................................................................. 6

21 U.S.C. § 841(a)(1) ....................................................................................................... 6

21 U.S.C. § 841(b)(1)(A) ..................................................................................... 6, 7, 16

21 U.S.C. § 846 ............................................................................................................. 6, 7

28 U.S.C. § 2255 ............................................................................................................... 9

Pub. L. No. 111-220, 124 Stat. 2372 ............................................................................ 16

Pub. L. No. 115-391, 132 Stat. 5194 ............................................................................ 16

**Rules**

U.S.S.G. § 1B1.13 .......................................................................................................... 12

**Other Authorities**

S. Rep. No. 98-225 .......................................................................................................... 12

United States Sentencing Commission Sourcebook tbl. 15 (2019)
    available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-
    sentencing-statistics/state-district-circuit/2019/nys19.pdf (last accessed January 26, 2021) .... 16

U.S. Dept. of Justice, Bureau of Justice Statistics, *Time Served in State Prison, 2016* (Nov. 2018)
    available at https://www.bjs.gov/content/pub/pdf/tssp16.pdf (last accessed January 26, 2021)
    .............................................................................................................................. 16

## I.    **<u>Introduction</u>**

Dontai Cabrera respectfully submits this memorandum in support of his motion, pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), to reduce his sentence.

Dontai is now 35 years old, and he has served over ten and a half years – the equivalent of just over 12 years with good time credit – of a twenty-year sentence for his role as a street-level participant in this crack distribution and firearm prosecution.  His sentence was driven entirely by the ten-year mandatory minimums applicable to each of the narcotics and firearm counts to which he pled guilty on December 10, 2010, the Friday before the Monday his trial was scheduled to start.

Both at the time of Dontai's guilty plea and at the time of his sentencing, this Court expressed serious misgivings about the twenty-year mandatory minimum Dontai faced.  Indeed, three co-defendants – who were charged with the same narcotics and firearm conduct but pled guilty earlier than Dontai – were permitted to enter into agreements requiring only a ten-year minimum term.  This Court sentenced each to approximately ten years, and they have since completed their terms and been released.  Other than the application of the statutory mandatory minimums, no justification for Dontai to receive such a lengthy sentence has ever been offered in the course of Dontai's sentencing, appeal, and subsequent 2255 motion.  As the Court explained at sentencing, the mandatory minimums effectively took the sentencing decision out of its hands.

Now with the passage of the First Step Act, authority to determine a just punishment in this case is back in the Court's hands, where it belongs.  We respectfully submit that the need to avoid unwarranted sentencing disparities; the extreme hardships Dontai has faced, including contracting COVID-19 while held at FCI Fort Dix, the federal prison having the worst COVID-19 outbreak in the system; and Dontai's exceptional rehabilitation constitute "extraordinary and

compelling circumstances" warranting reduction of Dontai's sentence to time served.[1]

## II.    Factual & Procedural Background

### A.  Dontai's Background

Dontai was born on May 12, 1985 in Bronx, NY to Carla Oliver and Paul Cabrera. Dontai's mother, who was 20 years old when he was born, struggled severely with addiction to drugs, including crack-cocaine.  Carla's addiction drove her to engage in highly risky behavior to support her habit.  Thus, for the early years of Dontai's life, his maternal grandmother, Katherine Oliver, a former court officer and corrections officer, cared for him.  Following Katherine's untimely death at age 45, his mother's older sister Donna Oliver assumed his care and relocated him to North Carolina, where they lived for about three years.

When Dontai was approximately five years-old, his aunt needed to relocate to Germany, so Dontai moved back to the Bronx, where he lived predominantly with his paternal grandmother, Mary Cabrera.  As his Aunt Andrea Oliver notes in her letter, during this time, Dontai's father Paul, who was working as a barber, became a part of Dontai's life, but did not step up to the responsibility of caring for his young son, making Dontai's life "tumultuous" and quite unstable.  *See* Exhibit 1 ("Oliver Letter") at 2.

Despite all of this childhood instability, Dontai's family recognized early on that he was a caring and respectful child with a warm heart and a particular love for wildlife.  While living with his Aunt Donna in North Carolina as a young child, he developed a lifelong attachment to nature, leading him to take in injured animals.  *See* Oliver Letter at 2; *see also* Exhibit 2 ("P.

---

[1] Dontai's projected release date, according to the Bureau of Prisons ("BOP") website, is August 11, 2027.  It is likely, however, that Dontai will be transferred to home confinement at least six months before then, in February 2027.  Accordingly, Dontai has approximately 72 months left to serve before he would be transferred to home confinement under normal conditions.

Cabrera Letter") at 1.  He pursued opportunities to learn more about animals and later developed

real skill in nurturing all kinds of pets, particularly dogs.  *Id.*  As his girlfriend Krystel Lopez

notes, he long dreamed of becoming a veterinarian, and his deep love for animals continues.  *See*

Exhibit 3 ("Lopez Letter"), at 1.

After returning to the Bronx, Dontai also began visiting his mother occasionally, but by

this time she had fallen ill with HIV/AIDS, as well as tuberculosis.  During their times together,

when Dontai was still just a young boy, rather than receiving support and guidance from his

mother, he nurtured and tended to her – bringing her water and medication – while she rested,

largely immobilized by her ongoing health conditions.  When Dontai was 7-years-old, his mother

succumbed to her illnesses and died.

As his father Paul notes, he knew that Dontai's "mother's death had great effect on him,"

but Dontai "hid his emotions very well."  P. Cabrera Letter at 1.  After his mother's death,

Dontai ostensibly lived with Paul, but spent most of his time at the home of his grandmother,

Mary, who then lived on DeKalb Avenue.  The house was crowded, with up to 6 adults and 8

children in the house at any given time.  The environment in his grandmother's house was

aggressive – all of the children in the home were boys and Dontai's grandfather, a mechanic and

former boxer from Puerto Rico, maintained a rough atmosphere where the boys physically

competed for everything, even food and a place to sleep.  As Dontai notes in his letter to the

Court, "fights [were] instigated by [his] elders to make sure we were tough enough."  Exhibit 1

("D. Cabrera Letter") at 1.  As the only child without a parent living in the home, and because his

mother was African-American and he was darker skinned than the other boys, Dontai was the

particular subject of painful bullying.  He often barely got the last scraps of food.  Dontai's

grandmother would frequently have to give him a spare dollar or two so that he could go to the

corner convenience store to buy something to eat.

Dontai's father came around from time to time, but spent most of his time elsewhere – pursuing women and otherwise indulging in his youth.  On occasion, Dontai's maternal aunt, Andrea, would bring him to her home to spend the weekend with her.  While still a child of 7 or 8, Dontai began finding support and friendships among those in the neighborhood having similarly troubled home lives.  Around age ten, Dontai moved in with his father, but continued to spend most of his time at his grandmother's home on DeKalb Avenue.  While living with his father, Dontai also lived with three of his father's then-girlfriends, each of whom had children of their own with Dontai's father.[2]  Predictably, this living situation proved highly unstable, and Dontai would often have to return to his grandmother's house.

Despite his difficult circumstances, Dontai excelled in school until approximately seventh grade, when he lost focus on his studies as he started to succumb to the negative influences of his crime-ridden neighborhood.  Dontai's father, who had by then settled down and started two businesses, attempted to return to his son's life, but Dontai could not let go of the dysfunctional "support system" he had found in the streets of the Bronx.

While he was a student at Harry S. Truman High School, at approximately 15 years old, Dontai was the victim of a stabbing. He was treated North Central Hospital for stab wounds in the chest and upper thigh and diagnosed with a collapsed lung.  Thereafter, at age 16, Dontai dropped out of high school, briefly attending Job Corps Academy, a high school equivalency/vocational training program located in Cassadaga, N.Y., near Buffalo.

After returning to the Bronx, Dontai pursued jobs working with a moving company and at a CVS store, but his troubles with street life continued.  In 2003, at age 18, Dontai and a friend

---

[2] Dontai has six younger paternal half-siblings, from four mothers.

4

got into a fight with a two other youths in the neighborhood that ended up with him and the friend taking their bicycles.  Facing criminal charges arising from the bicycle theft, Dontai pled guilty to a misdemeanor in February 2004 and was sentenced to a 90-day term at Riker's Island as a youthful offender.

Thereafter Dontai worked at his father's two hair salons in the Bronx.  Dontai helped his father manage these businesses and worked for him as a barber, but he remained unable to extricate himself from the dysfunctional world of the neighborhood friends of his youth. Dontai's father eventually lost his businesses.  In 2003, when he was approximately 18, Dontai moved in with his Aunt Andrea Oliver, with whom he resided for the next five years.

As Andrea explains in her letter, during those years, despite his struggles, she had a close relationship with Dontai.  He was the cook of the household day to day, and also "loved to make fancy cakes and pies"; on special occasions like Thanksgiving, he prepared the entire meal. Oliver Letter at 3; *see* Lopez Letter at 1.  Dontai also developed a warm relationship with his Aunt Andrea's young god-daughter, Phantasia, who was living with Andrea while she was going through a difficult time in her childhood not unlike what Dontai had experienced.  *Id.*  Dontai also sought to develop his gift for drawing.  His Aunt Andrea would bring home drawing materials and frames from a store on Canal Street, and Dontai would draw "beautiful pictures" that she would sell to raise a little extra money to support his education.  *Id.* at 3.During this period, when Dontai was 23-years-old, he endeavored to make a real break with his past and change his life.  It was around this time that he began a romantic relationship with Krystel Lopez, a childhood friend, who has supported Dontai throughout his time in prison and remains his girlfriend to this day.  *See* Lopez Letter.  In 2008, he enrolled at Monroe College, where he studied culinary arts for seven months.  Dontai had to give up his studies, however, when he

could no longer afford the tuition.  During this time, Dontai also began working in construction and briefly joined Carpenter's Local Union 210, of which his father was also a member.  Dontai could not escape his earlier life, however, and on June 30, 2010, at the age of 25, Dontai was arrested for the instant offense.

## B.  Offense Conduct

According to Dontai's Pre-Sentence Report ("PSR"), from approximately 2002 through 2010 Dontai engaged in crack distribution and related firearms violations as a member of the Rochambeau Avenue Crew in the vicinity of Rochambeau Avenue in the Bronx.  PSR ¶¶ 17, 18. The PSR states that Dontai discharged a firearm in the direction of rival drug dealers on two occasions, one in 2003 and another in October/November 2006, in the vicinity of 212th Street and DeKalb Avenue in the Bronx.  PSR ¶ 37.  There is no assertion that these discharges resulted in any injuries.

## C.  Procedural History

On February 11, 2010, a grand jury in this district indicted Dontai and six co-defendants, Maurice Patterson, Orlando Bermudez, Tyshiem Topping, Jamar Miller, Tyrone Oldyn, and Wayne Thompson, by way of seven nearly identical indictments, on two counts:

1.  Pursuant to 21 U.S.C. § 846, a conspiracy to distribute a possess with intent to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A) ("Count 1" or "Narcotics Charge").

2.  Pursuant to 18 U.S.C. § 924(c)(1)(A)(iii), during and in relation to the narcotics conspiracy, use, carry, possession, and aiding and abetting the use and possession of firearms, which were discharged ("Count 2" or "Firearm Charge").

Dontai was arrested on June 30, 2010 while visiting his half-sister in Tallahassee, in the Northern District of Florida, and detained. PSR ¶ 44. On July 15, 2020, Curtis Farber, Esq. was appointed as counsel to Dontai. On November 24, 2010, a couple of weeks shy of Dontai's mid-December trial date, Dontai obtained new counsel, William Martin, Esq., a friend of Dontai's father. Dkt. No. 103. By this point, each of Dontai's co-defendants had already pleaded guilty. On December 10, 2010, just three days shy of his December 13, 2010 trial date, Dontai pleaded guilty to Count 1 and Count 2.

During the change of plea hearing, Your Honor inquired whether the government had considered a plea agreement with a less harsh mandatory minimum: "Let me ask the government while I'm – because just looking at the defendant's parents, it really breaks my heart to see this, does the defendant have any prior convictions?" Exhibit 5, ("Plea Tr.") at 15:4-7. The Assistant U.S. Attorney answered: "Only misdemeanor, your Honor." *Id*. at 15:8. In response, Your Honor replied: "There's no doubt from what he's told me that he's guilty of both counts. I wonder whether the government, nevertheless, had considered whether it was necessary to have a 20 year mandatory [minimum] in a case like this." *Id.* at 15:9-13. The prosecutor answered in the affirmative, but did not provide a reason or any other information. *Id.* at 15:14. No such reason appears anywhere else in the record of this case.

**D. Statutory and Guidelines Provisions Applicable to Dontai's Sentence**

Both charges to which Dontai pleaded guilty carry statutory mandatory minimums. At the time of his sentence, Count 1 required a mandatory minimum of ten years' imprisonment pursuant to 21 U.S.C. §§ 846 and 841(b)(1)(A). PSR ¶ 108. Similarly, Count 2 carried a mandatory minimum of ten years' imprisonment, which must be imposed to run consecutively to any other term of imprisonment, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii). *Id.* ¶ 109.

7

Based on its finding that Dontai was responsible for conspiring to distribute between 840 grams and 2.8 kilograms of crack cocaine, the Probation Department determined that his base offense level was 34, which it reduced by 2 pursuant to Section 3E1.1(a) in recognition of Dontai's acceptance of responsibility for the offense. *Id.* ¶¶ 56, 62. Thus, in total, the Probation Department determined that Dontai's adjusted Guidelines offense level was 32. *Id.* ¶ 65. Based on Dontai's criminal history, which included misdemeanor convictions at age 16 and age 18, the Probation Department found that he had 3 criminal history points and therefore fell within Criminal History Category II. *Id.* ¶¶ 66-77. Accordingly, the Probation Department determined that Dontai's Guidelines range of imprisonment for Count 1 was 135 to 168 months followed by the mandatory and consecutive term of 120 months for Count 2. *Id.* ¶ 110.

### E. Dontai's Sentencing Hearing

Dontai appeared before Your Honor for sentencing on June 13, 2011. At the outset, the Court noted its view was that "this is one of those cases where the Court's hands are largely tied" by the applicable mandatory minimum. Exhibit 6, ("Sent. Tr.") 3:7-8. Dontai's attorney, William T. Martin argued principally, and briefly, that the minimum sentence Dontai faced, of 240 months, was "more than enough." *Id.* at 3:17 – 4:1. The Court noted that it had received "excellent letters from numerous people on the defendant's behalf" and explained that were it not for the mandatory minimum, it would have considered a sentence of between ten and twenty years, stating: "I certainly, were it not for the requirements of law, might have considered a sentence less than 20 years." *Id.* at 4:3-7. The Court expressed it views regarding mandatory minimums, but explained that it was bound, and would follow the law. *Id.* at 4:8-9; 15-18.

When it was his opportunity to speak, Dontai, after apologizing to his family and the Court, expressed confusion at the length of his sentence. *Id*. at 5:4-7; 24-25. The Court

8

explained that the application of the 240-month sentence was required because Dontai's pleaded

guilty to both counts, including the Firearm Charge. *Id.* at 5:8-9; 12-19. Your Honor expressed

sympathy for Dontai's situation, but emphasized that as his sentence was the operation of

mandatory minimums, the Court had no discretion in the matter. *See id*. at 5:19-21; 6:11-23.

The Court characterized the 240-month sentence as "a very heavy sentence" but

explained that it was "the absolute minimum the law requires." *Id*. at 6:21-23. And when Dontai

asked whether the two ten-year sentences could run concurrently, *id*. at 6:24-25, Your Honor

replied "No. Believe me, I wish that were the case. . . . I assure you, if there were any way

possible under the law to run those sentencing concurrently, I would consider that. There is

none." *Id.* at 7:1-5. The Court thereafter imposed the sentence of 240 months. *Id.* at 7:11-14.

### F.  Dontai's Post-Conviction Litigation

On appeal, Dontai argued that he received ineffective assistance of counsel, citing various

deficiencies in his counsel's efforts. *See* Dkt. No. 162 at 2. On May 22, 2014, his appeal was

dismissed for failure to offer a meritorious argument that would overcome the waiver of his right

to appeal included in his plea agreement. *Id*. at 3-4.

Dontai subsequently filed a motion to vacate pursuant to 28 U.S.C. § 2255 ("2255

Petition"). Dkt. No. 209. Dontai's 2255 Petition included as grounds for relief that he received

ineffective assistance of counsel at trial and on appeal and that he involuntarily and unknowingly

entered a plea induced by counsel's ineffective assistance. Dkt. No. 209 at 5-10. This Court

denied Dontai's 2255 Petition following a Report and Recommendation from U.S. Magistrate

Judge Kevin Nathaniel Fox recommending denial on procedural grounds. Dkt. No. 211.

### III.    Argument

The Court appropriately recognized at the time of sentencing that its discretion was unduly fettered by the statutory mandatory minimum.  Indeed, as the government conceded in its opposition to Dontai's 2255 Petition, "the transcript of the sentencing proceeding reflects that the Court likely would have sentenced the defendant to a lower sentence based on his individual characteristics but for the mandatory minimums required by law." *United States v. Dontai Cabrera*, No. 15 Civ. 5915 (JSR) (KNF), Dkt. No. 13, at *8 (S.D.N.Y. July 22, 2015).  It is apparent based on the circumstances of the offense and a comparison with the sentences of Dontai's co-defendants that the twenty-year sentence the Court was required to impose was excessive.  Now Congress has given the Court the authority it needs to correct it and impose a just sentence on Dontai, while he still has much of his life ahead of him.

At age 35, and having spent over ten and a half years in prison, Dontai is no longer the irresponsible young man he was during his teenage years and early 20s when he committed the offenses at issue.  As he explains in his letter to the Court, "I left your courtroom an ignorant boy but I have c[o]me a long way since then." D. Cabrera Letter at 1.  He accepts responsibility and expresses true remorse and shame for his criminal conduct.  Dontai has changed his life while incarcerated.  He willed himself to accomplish his rehabilitation and preparation to re-enter society productively, reading voraciously and taking every course offered in prison, becoming an instructor to other inmates.  He has a loving and supportive family who await his return home.

The equivalent of a more than twelve year term that Dontai has already served has been more than ample to accomplish the goals of sentencing.  As set forth below, pursuant to 18 U.S.C. § 3582(c)(1)(A), "extraordinary and compelling reasons" exist warranting the reduction of Dontai's sentence to time-served.

**A.  The Court has the Authority to Reduce Dontai's Sentence to Time-Served**

Under a provision of the recently-enacted First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), a sentencing court,

> upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment …, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; …
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission ….

18 U.S.C. § 3582(c)(1)(A).

The First Step Act's changes to Section 3582(c)(1)(A)—titled "Increasing the Use and Transparency of Compassionate Release"—were designed to help get more individuals out of prison.  Indeed, "[t]he First Step [Act] was passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *United States v. Redd*, No. 97 Cr. 06 (AJT), 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). "Congress's express purpose in implementing these changes was to expand the use of compassionate release sentence reductions under § 3582(c)(1)(A)." *United States v. Young*, 458 F. Supp. 3d 838, 844 (M.D. Tenn. 2020).

In particular, the First Step Act expands the use of sentence reductions in two primary ways:  First, the Act empowers defendants to petition district courts directly for a reduction, rather than having to wait for the Bureau of Prisons to bring a motion on their behalf.  Second, the Act shifts greater discretion to courts to determine what constitutes "extraordinary and compelling" reasons for a reduction under the statute, with no limits on what may constitute

11

those reasons.  As Judge Preska recently explained, Congress envisioned § 3582(c)(1)(A) as a "safety valve" to permit courts to reduce sentences when justified, which would also maintain "sentencing power in the judiciary where it belongs" (rather than with a parole board).  *United States v. Millan*, No. 91 Cr. 685-1 (LAP), ECF Dkt. 1060, at \*15-16 (S.D.N.Y. Apr. 6, 2020) (quoting S. Rep. No. 98-225, at 56 (1983)).

The Second Circuit has confirmed that there are no limits to the grounds that can constitute "extraordinary and compelling reasons" warranting compassionate release under § 3582(c)(1)(A), rejecting the argument that such grounds are limited to those set forth in Application Note 1 to U.S.S.G. § 1B1.13.  *United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020), *reh'g denied*, No. 19-3218, Dkt. No. 104 (Dec. 9, 2020).  Consistent with *Brooker*, in assessing a Section 3582(c) motion brought directly by a defendant, this "Court is not constrained by either § 1B1.13's enumeration of extraordinary and compelling reasons, or its freestanding requirement that the defendant seeking release not pose any danger to the community.  Rather the Court, 'after considering the factors set forth in section 3553(a) to the extent that they are applicable,' 18 U.S.C. § 3582(c)(1)(A)(i), may 'consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release.'"  *United States v. McRae*, No. 17 Cr. 643 (PAE), 2021 WL 142277, at \*3 (S.D.N.Y. Jan. 15, 2021) (quoting *Brooker*, 976 F.3d at 237).  Indeed, even before *Brooker*, this Court recognized that "courts are not, in any case, bound by [U.S.S.G. § 1B1.13] and may grant compassionate release 'on grounds that are distinct from, but of similar magnitude and importance to, those specifically enumerated in Application Note 1.'"  *United States v. Austin*, No. 06 Cr. 991 (JSR), Dkt. No. 72 at 7 (S.D.N.Y. June 23, 2020) (quoting *United States v. Pinto-Thomaz*, No. 18 Cr. 579 (JSR), 2020 WL 1845875, at \*2 (S.D.N.Y. Apr. 13, 2020)).

Based on this authority, district courts have reduced sentences for a wide variety of reasons. For example, many courts have reduced defendants' sentences based on the ongoing threat COVID-19 poses to individuals in prison. *See* Appendix A for a list of citations, too numerous to cite here. Courts have also reduced sentences where the defendant's original sentence now seems disproportionately high, where a defendant has demonstrated extraordinary rehabilitation, or where other factors counsel in favor of a reduction. *See, e.g.*, *United States v. Haynes*, No. 93 Cr. 1043 (RJD), ECF Dkt. 114, at *29-30 (E.D.N.Y. Apr. 22, 2020) (reducing a 46-year sentence based on "stacked" § 924(c) sentences to time served based on the excessive severity of the sentence); *Millan*, No. 91 Cr. 685 (LAP), ECF Dkt. 1060, at *25-29 (reducing sentence of 57-year old defendant from life to time served, 28 years, based on defendant's exceptional rehabilitation, length of time already served, and demonstrated remorse); *Redd*, 2020 WL 1248493 at *8, n.18 (collecting cases regarding court's authority and reducing sentence based on severity of defendant's "stacked" § 924(c) sentences); *United States v. Maumau*, No. 08 Cr. 758 (TC), 2020 WL 806121, at *6 (D. Utah Feb. 18, 2020) (reducing sentence based on severity of sentence and defendant's young age at the time of the offenses); *United States v. Urkevich*, No. 03 Cr. 37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (reducing sentence based on original sentence's undue severity).

## B. Dontai has Exhausted His Administrative Remedies

Dontai has filed a request with the warden of the facility in which he is incarcerated, FCI Fort Dix, for release on three occasions. On March 30, 2020 and October 28, 2020, respectively, Dontai submitted his first and second requests to the warden for relief under the CARES Act for release on home confinement. Exhibits 7, 8. Both requests were denied shortly after their submission. *See id.* In response to Dontai's October 28 request, the disposition indicates that

13

Dontai "may submit a request for compassionate release/RIS to the Warden for consideration."

Exhibit 8.  On November 18, 2020, Dontai submitted such a request to the warden, asking for

compassionate release, or in other words a sentence reduction pursuant to 18 U.S.C. §

3582(c)(1)(A).  Exhibit 9.  More than 30 days have passed, and Dontai has not yet received a

response from the warden.  Accordingly, Dontai has more than complied with the statutory

exhaustion requirement.

C. **Extraordinary and Compelling Reasons Support the Reduction of Dontai's Twenty-Year Sentence to Time-Served**

1. <u>**The Circumstances of Dontai's Offense and Need to Avoid Unwarranted Sentencing Disparities**</u>

Dontai does not dispute that he engaged in serious criminal conduct.  Still, reducing his

sentence to time-served appropriately reflects the nature and circumstances of his offense, and

fairly takes into account the sentences imposed on his co-conspirators.

Dontai's role in the narcotics distribution charged in the indictment was limited to the

street level sale of crack-cocaine.  PSR ¶¶ 45-51.  He received no upward guidelines adjustment

for a leadership or supervisory role in the offense, and the PSR does not assert that Dontai ever

supervised or recruited any co-conspirators, nor does it hold him responsible for distributing a

larger quantity of narcotics than some others among the co-conspirators.

Section 3553(a) instructs that the sentencing judge should consider sentences previously

imposed upon similarly situated defendants in order to avoid unwarranted and disproportionate

sentencing disparities.  *See United States v. Florez*, 447 F.3d 145, 158 (2d Cir. 2006).  Although

each of each of Dontai's co-conspirators was indicted on the same narcotics and firearm charges

he was, and according to the PSR (with one exception), each engaged in firearm conduct

equivalent to Dontai's, Dontai received a sentence approximately double that imposed on the

three who received the next longest sentences (Miller, Oldyn, and Patterson); more than three times as long as the next (Topping); and more than ten times as long as the remaining two (Thompson and Bermudez, who appear to have cooperated with the prosecution).  Each of Dontai's co-defendants has been released from prison.[3]

The following chart summarizes the sentences imposed upon, firearm conduct of, and release dates of, Dontai's co-defendants.

| **Name** | **Sentence** | **Firearm Discharge** | **Release Date** |
|---|---|---|---|
| Jamar Miller | 120 months | Discharged firearm at individual in 2006 (PSR ¶ 32) | August 1, 2019 |
| Tyrone Oldyn | 130 months | Shot at identified rival drug dealer in 2005; discharged firearm at an individual again in 2006 (PSR ¶¶ 29-30) | March 25, 2019 |
| Maurice Patterson | 120 months | Discharged firearm at rival drug dealer in early 2004, and 2003 (PSR ¶¶ 23-24) | March 15, 2019 |
| Wayne Thompson | Time served (20 months) | Shot at rival drug dealers in 2005 and fall 2006 (PSR ¶¶ 34, 35) | December 14, 2011 |
| Tyshiem Topping | 71 months | Discharged firearm at rival drug dealers and stabbed one of them in March 2006 (PSR ¶ 27, 28) | June 5, 2015 |
| Orlando Bermudez | Time served (22 months) | Possessed loaded firearm (PSR ¶ 26) | December 13, 2011 |

Messers. Miller, Patterson, and Oldyn were each permitted to resolve their charges by pleading guilty to only Count 1, which carried a ten-year mandatory minimum.  Thus, when the Court was allowed the discretion to sentence down to that level with respect to co-defendants who had engaged in the same conduct, it exercised its discretion accordingly (except for imposing an additional ten months in Oldyn's case).  Messrs. Bermudez, Thompson, and

---

[3] Two of them have returned to prison due to violations of the conditions of their release.

15

Topping, as to whom Your Honor had even greater discretion, received terms of imprisonment representing a fraction of Dontai's sentence.

Accordingly, Dontai's twenty-year sentence – driven entirely by the mandatory minimum sentence applicable at the time[4] – is starkly out of line with those of his co-defendants. It is also objectively excessive for his conduct. The sentence Dontai received is longer than the median sentence for murder convictions in the Southern District of New York (median sentence for 47 murder cases in 2019 was 219 months)[5] and it is far more than the median amount of time served on murder sentences imposed in state courts nationwide (approximately 13 years).[6]

---

[4] We note that, pursuant to the Fair Sentencing Act of 2010 and the First Step Act, Congress's reduction of mandatory minimums applicable to crack distribution applies to the charge in Dontai's case, making him eligible for resentencing at a lower minimum of fifteen years. Section 2 of the Fair Sentencing Act of 2010 increased from 50 grams to 280 grams the amount of crack cocaine required to trigger the typically ten-year minimum term imposed by 21 U.S.C. § 841(b)(1)(A). Pub. L. No. 111-220, 124 Stat. 2372, § 2(a). The First Step Act, passed in December 2018, made this provision retroactive. Pub. L. No. 115-391, 132 Stat. 5194. When Dontai was indicted in February of 2010, the 50 grams charged in his indictment triggered a ten-year mandatory minimum and a life maximum under Section 841(b)(1)(A), but Section 2 of the Fair Sentencing Act modified the statutory penalties such that the 50 grams charged trigger only the 5-year mandatory minimum and 40-year maximum pursuant to Section 841(b)(1)(B). Accordingly, and consistent with this Court's prior ruling in *United States v. Martinez*, the charge upon which Dontai was indicted constitutes a "covered offense" within the meaning of Section 404(a) of the First Step Act. No. 4 Cr. 48-20 (JSR), 2019 WL 2433660, at *2 (S.D.N.Y. June 11, 2019); *see also United States v. Whitemore*, 573 F. App'x 24 (2d Cir. 2014) (summary order). As this Court has found, "[s]uch a substantial change in the minimum and maximum warrant some relief [for a defendant] who was sentenced in the more punitive context of a ten-year minimum and life maximum." *Martinez*, 2019 WL 2433660, at *3. For the reasons set forth herein, however, we respectfully submit that reducing Dontai's sentence to time-served pursuant to the Court's authority under 18 U.S.C. § 3582(c)(1)(A) is the more appropriate outcome.

[5] United States Sentencing Commission Sourcebook tbl. 15 (2019) available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/nys19.pdf (last accessed January 26, 2021).

[6] U.S. Dept. of Justice, Bureau of Justice Statistics, *Time Served in State Prison, 2016* (Nov. 2018) available at https://www.bjs.gov/content/pub/pdf/tssp16.pdf (last accessed January 26, 2021).

16

Accordingly, we respectfully submit that a reduction of Dontai's twenty-year sentence is needed to "avoid unwarranted sentence disparities" among similarly situated defendants, *see* 18 U.S.C. § 3553(a)(6), and that such disparity constitutes an "extraordinary and compelling" circumstance that supports reduction of his sentence to time-served. *See United States v. Clare*, No. 12 Cr. 792 (ARR), ECF Dkt. 137, at \*9-10 (E.D.N.Y. Jan. 25, 2021) (reducing sentence to time-served where defendant convicted of narcotics conspiracy and unlawful use of a firearm in furtherance thereof received a sentence significantly longer than those of his co-defendants); *see also United States v. Modesto*, No. 17 Cr. 251 (PGG), 2020 WL 4735340, at \*6 (S.D.N.Y. Aug. 13, 2020) (granting release to obese defendant where court found mandatory sentence excessive at time of sentencing).

### 2.  <u>The Unusually Onerous Conditions of Dontai's Incarceration: COVID-19</u>

With the onset of the COVID-19 pandemic in March 2020, the last year of Dontai's imprisonment has been extraordinarily onerous, as the conditions at his facility, FCI Fort Dix, have deteriorated to reaching the highest number of active cases of COVID-19 in the federal prison system.  As of January 12, 2021, according to the BOP's own statistics, FCI Fort Dix had 797 inmates and 26 staff members suffering from active cases. *See COVID-19 Coronavirus*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (visited January 12, 2021).  This is nearly double the number of infections of the next-most-infected BOP facility, the Federal Medical Center in Lexington, KY.  *See id.* Additionally, and unlike the Kentucky facility, FCI Fort Dix had yet to receive a single shipment of the vaccine as of mid-January.  *See* Exhibit 10.

BOP's failure to control the spread of COVID-19 at FCI Fort Dix has created an environment of extraordinary and well-warranted panic among inmates, like Dontai, who fear that they will contract the virus, get very sick, and die in Fort Dix due to insufficient medical

care.  Their fears are not unfounded, as Fort Dix recently reported its first inmate death due to COVID-19.[7]  *See* Exhibit 11.

Such unusually onerous conditions of confinement "may in appropriate cases be a permissible basis" for a reduced sentence.  *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (discussing downward departure); *see also United States v. Rodriguez*, 651 F. App'x 44, 48 (2d Cir. 2016) (citing *Carty* for proposition that "harsh conditions of imprisonment can provide basis for sentencing departure"); *see also United States v. Francois*, Case No. 16-cr-00281 (PKC), Minute Entry dated January 7, 2021 (E.D.N.Y. Jan. 7, 2021) (granting motion for compassionate release from Fort Dix based in large part on COVID-19 crisis in the facility).

Dontai's fear became reality in October 2020, when he tested positive for COVID-19. *See* Exhibit 13.  In the days and weeks leading up to and following his diagnosis, Dontai suffered significant systems, including chest pain, intense nausea, headaches, fatigue, sore throat, and difficulty breathing, especially at night.  Although Dontai's symptoms have since subsided somewhat, he still endures bouts of nausea and chest pain.  Consistent with press reports, Dontai was nevertheless transferred back into general population without ever having tested negative for COVID-19.  The stress Dontai has experienced over the past four months due to his COVID-19 diagnosis is particularly acute given his co-morbidity of obesity (*see* Exhibit 14 (showing body mass index ("BMI") of 34.1 kg/m)) and previous diagnosis of collapsed lung, or pneumothorax (*see* PSR ⁋ 87 (describing Dontai suffering a stab wound to the chest)).[8]

---

[7] Following the inmate's death due to COVID-19, the prison's warden David Ortiz has been temporarily reassigned to the BOP's Northeast Regional Office, an administrative office in Philadelphia.  *See* Exhibit 12.

[8] The CDC has identified adults of any age who suffer from obesity (a BMI of 30 kg/m or higher) as having an increased risk of severe illness from COVID-19.  *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention, lasted updated Dec. 29, 2020,

In addition to the harsh conditions of confinement created by Dontai's COVID-19 diagnosis, the diagnosis itself, coupled with Dontai's underlying conditions of obesity and prior pneumothorax, presents a risk of re-infection and long-term side effects, and thus supports a finding of extraordinary and compelling circumstances. *See United States v. Davis*, No. 06 Cr. 20020-002 (SEM), 2020 WL 4049980, at *3 (C.D. Ill. July 20, 2020) (granting sentence reduction for obese diabetic inmate who has completed 13 years of a 240-month prison term and who had tested positive for COVID-19 but was asymptomatic aside from loss of taste and smell, where "the Court finds that there is a chance that Defendant may contract COVID-19 again" and "the CDC recognizes that it is possible for an individual who had COVID-19 to become infected again by the virus"); *United States v. Barajas*, No. 18 Cr. 736 (NSR), 2020 WL 3976991, at *9-10 (S.D.N.Y. July 13, 2020) (granting release for a 36-year-old defendant at who had tested positive for COVID-19 three weeks earlier, had undiagnosed asthma but no other preexisting conditions); *United States v. Yellin*, No. 15 Cr. 3181-1 (BTM), 2020 WL 3488738, at *3 (S.D. Cal. June 26, 2020) (granting release for inmate with underlying medical conditions who was infected with COVID-19, but did not develop severe symptoms, because of, among other things, risk that reinfection would have on the inmate's health); *United States v. Williams*, No. 19 Cr. 134 (PWG), 2020 WL 3073320, at *4 (D. Md. June 10, 2020) (granting release where defendant

---

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited January 25, 2021). Additionally, the medical community has identified prior pneumothoraxes, or incidents of "collapsed lung," as placing a COVID-19 patient at greater risk for a ventilator-induced break in the lung lining. *See* The Marfan Foundation, *COVID-19 High Risk Patients and Ventilators*, April 7, 2020, https://www.marfan.org/about-us/news/2020/04/07/covid-19-high-risk-patients-and-ventilators#.YA82NuhKhPY (last visited January 25, 2021). *See also United States v. Martin*, No. 18 Cr. 834-7 (PAE), 2020 WL 1819961, at *3 (S.D.N.Y. Apt. 10, 2020) (finding that extraordinary and compelling reasons exist favoring early release due to the danger presented by the COVID-19 pandemic and the fact that "COVID-19 may present a heightened risk for [defendant], who [previously] suffered a punctured lung").

with an underlying health condition had contracted COVID-19 and recovered because "it [was] uncertain whether [defendant could] contract COVID-19 more than once, and the potential long-term effects of the illness are still undetermined" when factoring his health condition).[9]

### 3.  Dontai's History, Characteristics and Exceptional Rehabilitation

As described in detail above, Dontai faced a childhood buffeted by the trauma of the loss of his mother to drug-addiction and AIDS when he was a young child; the instability of bouncing from household to household, from a grandmother, to an aunt, to his father and his series of girlfriends and new babies, toa grandparents' apartment characterized by its brutality; and a neighborhood riddled with drugs and crime.  Despite those obstacles, however, those who know him best have observed his kind, modest, and nurturing nature. His Aunt Andrea describes how since he was a young boy, he has unselfishly rejected her offers of extravagant gifts, in recent years preferring a book or two to cash.  Oliver Letter at 3.  She describes how he always lent her a hand around the house with things she could not do alone.  *Id.* at 4.

His girlfriend Krystel describes how Dontai would quietly "slide a few bucks under the door" to help support her estranged mother when Krystel rejected her requests, how he was there to support Krystel when she had nowhere else to turn, how he picked her up from the bus stop at night, and how he had dinner cooked for her when she got home from work.  Lopez Letter at 1. While he has been incarcerated, he has been a positive influence and steady source of emotional

---

[9] *See also United States v. Torres*, No. 17 Cr. 501 (NSR), ECF Dkt. 23, at *1 (S.D.N.Y. Aug. 7, 2020) (granting release to defendant at FCI Miami with diabetes, obesity, hypertension, and an injured lung); *United States v. Zoquier-Solano*, No. 13 Cr. 772 (JPO), ECF Dkt. 45, at *2-4 (S.D.N.Y. Aug. 10, 2020) (granting release to defendant at FCI Fort Dix who had hypertension, hyperlipidemia, and borderline obesity and had served seven years of ten-year mandatory minimum sentence); *United States v. Avery*, No. 14 Cr. 810 (JMF), 2020 WL 6728781, at *2 (S.D.N.Y. Nov. 16, 2020) (granting release to clinically obese defendant who had served more than 70% of sentence).

support for Krystel, providing advice and guidance on bettering her life.  *Id.* at 2.  In Lopez's

words, Dontai "is a good man with a heart of gold despite his past."  *Id.* at 3.

### a. Rehabilitation

The best proof of Krystel's observation about Dontai's character, and of why he is

worthy of a chance to re-enter society now, is his actions since he has been incarcerated.  Dontai

has maintained a positive outlook and has sought to improve himself to the greatest extent

possible while in prison.

In particular, Dontai successfully completed more than 60 rehabilitative programs

involving well over 1,000 hours of programming.  *See* Exhibit 15 ("Progress Report") and

Exhibit 16.  In some of his coursework, Dontai has done so well that he has become an instructor

– serving as a facilitator for the Alternatives to Violence Program ("AVP") at Ford Dix and

teaching Black History as well as Yoga.  *See* Progress Report at 1.  In his role as a facilitator for

the AVP program, Dontai was selected by the course instructors to share what he had learned

regarding alternatives to violence with other prisoners and to lead his contemporaries in their

assignments and discussions.

Dontai's passion for learning and self-improvement has extended well beyond the

coursework offered by BOP.  Dontai has also read hundreds of books on a wide range of topics,

leading people around him to jokingly characterize him as a "nerd."  *See* Lopez Letter at 2; *see*

*also* Oliver Letter at 3.  His vigorous self-study enabled him to teach multiple courses on Black

History.  And, consistent with his studies at Monroe College prior to his arrest, Dontai had, prior

to COVID-19, begun working towards college credit via a program with Mercer County College.

*See* Progress Report at 1.

21

In short, Dontai's well documented and exceptional record of rehabilitation demonstrates how productively he has used his years behind bars and how he has turned his life around and made himself ready and worthy to take his place in society.  Indeed, the BOP's internal evaluation system for re-entry into the community, called "Pattern Risk Scoring," places Dontai in a low risk category, both overall and in the general and violent subcategories.  *See* Exhibit 17.  As Dontai puts it:  "I had to educate myself so I could show my family and friends I'm better th[a]n this. . . . I'm not a criminal any more.  I dream of going to work, walking my dog and picking my kids up from school one day.  I just need a chance to make things right."  D. Cabrera Letter at 1.

b.   <u>Dontai's Ten Years of Clean Disciplinary History</u>

Further powerful evidence of Dontai's rehabilitation is that he has long maintained a spotless disciplinary history.  *See* Exhibit 18.  His sole infraction – assault without serious injury – occurred nearly ten years ago in August 2011, shortly after Dontai's initial arrest, and followed an attempt by Dontai to intervene in a fight between other inmates.  *See id.*  For Dontai, his resulting stay in solitary confinement solidified his commitment to turn his life around.  There is no better proof of that commitment than the remaining blank pages of his disciplinary history.  *See United States v. Osuna*, No. 02 Cr. 1327 (CPS), 2008 WL 1836943, at *2 (E.D.N.Y. Apr. 22, 2008) (reducing defendant's sentence pursuant to 18 U.S.C. § 3582(c)(2) where "[d]efendant has maintained good conduct and has not been subject of disciplinary action during his entire period of incarceration").

c.   <u>Dontai's Continued Family Support</u>

During his over ten and a half years in prison, Dontai has worked hard to maintain close relationships with his family and support network.  His father Paul notes the extraordinary effort Dontai has made with respect to his six younger half-siblings, describing how Paul has

22

personally "witnessed how much effort he puts into staying present in their lives and letting them know he cares even though he isn't physically here." P. Cabrera Letter at 2. His Aunt Andrea describes their continued "long healthy conversations until the prison ends the call." Oliver Letter at 3. And Krystel describes how he has stayed positive and strong despite the very difficult conditions he has faced in prison since the pandemic, and how he continues to guide and support her in life from "the sideline." Lopez Letter at 2.

Each of these individuals, who comprise Dontai's core support system, are ready and able to help Dontai when he is released. Dontai's Aunt Andrea, with whom Dontai lived for a number of years prior to his arrest in this case, has a bedroom ready and waiting for him. *See* Oliver Letter at 4. She works in banking and resides in a three-bedroom apartment in the Co-Op City section of the Bronx. *See* Oliver Letter at 1. Dontai's father Paul, who now works as a carpenter, also lives nearby *See* P. Cabrera Letter at 2. Krystel, who has known Dontai since both were children and has been dating him since 2007, now lives in Hopewell, Virginia and works at an extended stay facility serving military personnel, and will continue to provide emotional support. *See* Lopez Letter at 1. Upon release, Dontai hopes to return to work in construction, an effort his family is eager to support. *See* D. Cabrera Letter at 2; P. Cabrera Letter at 2. Eventually, Dontai would like to have a family of his own, including lots of children. *See id.* at 1; Lopez Letter at 3. Dontai has plans to partner with non-profits in his community and continue his work with the Alternative To Violence Program and otherwise mentoring young people, to help them avoid many of his own mistakes. *See* D. Cabrera Letter at 1. Dontai sees early release as an opportunity to break the "cycle of ignorance" and take his place in the world. *Id.*; *see* Lopez Letter at 3.

23

*****

It is well established that post-sentencing rehabilitation may be an important factor when a court has the opportunity to reconsider a defendant's sentence.  *See Pepper v. United States*, 562 U.S. 476, 481 (2011) (holding that "when a defendant's sentence has been set aside on appeal, a district court at resentencing may consider evidence of the defendant's post-sentencing rehabilitation and that such evidence may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range").  Here, Dontai's exceptional rehabilitation, alone or in combination with the other reasons set forth herein, constitutes an "extraordinary and compelling reason" for reduction of his sentence to time-served.  In the face of a twenty-year sentence, he maintained a positive outlook, sought to improve himself, and succeeded in doing so.  Indeed, in light of the progress he has made, and particularly in light of the virtual absence of rehabilitative resources available to him in prison during the pandemic, and his having essentially exhausted the course offerings at Fort Dix, his continued incarceration would undermine the rehabilitative objectives Dontai has already accomplished and would impede his further rehabilitation.  *See, e.g., United States v. Griffiths*, 954 F. Supp. 738, 742-43 (D. Vt. 1997) (departing downward where defendant's rehabilitative "progress . . . would be not only slowed, but utterly frustrated" by incarceration); *United States v. Neiman*, 828 F. Supp. 254, 255-56 (S.D.N.Y. 1993) (departing downward in part because incarceration would result in a "setback in his rehabilitation" and "would interfere with rather than enhance [defendant's] prospect for rehabilitation").

24

## IV.     <u>Conclusion</u>

Accordingly, for all of the foregoing reasons, we respectfully submit that this Court should enter an Order, pursuant to 18 U.S.C. § 3582(c)(1)(A), reducing defendant Dontai Cabrera's twenty-year sentence to time-served.

Dated:  New York, New York
       February 12, 2021

 

Respectfully submitted,

MORVILLO ABRAMOWITZ GRAND
  IASON & ANELLO P.C.

By: _/s/ Richard F. Albert_
      Richard F. Albert
      Margaret N. Vasu
565 Fifth Avenue
New York, New York 10017
Tel: (212) 880-9600
ralbert@maglaw.com
mvasu@maglaw.com

*Attorneys for Dontai Cabrera*

25